**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
ANDREW SMITH,

              Plaintiff,

    -against-                                        **COMPLAINT**

THE CITY OF NEW YORK; THE MAYOR OF NEW YORK     **ECF Case**
CITY BILL DE BLASIO; THE NEW YORK CITY POLICE
COMMISSIONER DERMOT SHEA; POLICE OFFICER    **Jury Trial Demanded**
MICHAEL SHER; and JOHN DOE 1-10 (NYPD Deputy
Commissioners, Commanding Officers and Supervising
Officers responsible for directing and supervising the NYPD's
response to the George Floyd and Breonna Taylor peaceful
protests, whose names are currently unknown to Plaintiff),

              Defendants.
------------------------------------------------------------------------X

      In this civil rights action, Plaintiff Andrew Smith ("Mr. Smith" or "Plaintiff") seeks relief for violations of his rights secured by the First, Fourth, and Fourteenth Amendments to the United States Constitution, and for his rights secured by the laws of the State of New York and City of New York. The claims arise from an incident that occurred on or about May 30, 2020. During the incident, the City of New York ("the City") and members of the New York City Police Department ("NYPD") subjected Mr. Smith to, among other things, the excessive use of force, unlawful search and seizure, civil assault and battery, interference with his right to free speech, racial discrimination, and constitutionally deficient supervision and training of NYPD employees. Mr. Smith seeks compensatory damages, punitive damages, an award of costs and attorney's fees, equitable and injunctive relief, and such other and further relief as the Court deems just and proper.

## PRELIMINARY STATEMENT

      On March 13, 2020, Breonna Taylor, an unarmed Black woman, was shot and killed in the middle of the night by Louisville police officers in her own home. On May 25, 2020, George Floyd

was choked to death by a Minneapolis police officer, who threw Mr. Floyd face-down on the ground and put his knee on Mr. Floyd's neck while Mr. Floyd repeatedly stated he could not breathe. Shortly after these police-involved killings, protests calling for racial justice and an end to racialized police violence erupted across the world, including in New York City.

On May 30, 2020, Plaintiff Andrew Smith joined thousands of people in Brooklyn peacefully protesting the long and sustained history of police violence against people of color in the City and across the country. That day, Defendant Michael Sher, an NYPD officer who was policing the protests, confronted Mr. Smith, forcibly snatched off Mr. Smith's facemask, and deployed pepper spray directly into his face. Defendant Sher assaulted Mr. Smith without provocation or warning as Mr. Smith stood among other demonstrators with his hands raised high to signal that he was protesting peacefully. Defendant Sher assaulted Mr. Smith, a young Black man, but chose not to assault nearby white protesters who, like Mr. Smith, were standing with their hands raised. In addition to causing Mr. Smith to suffer great physical pain and discomfort, this assault loomed large over his life for months as video of the assault went viral and officers wearing the same uniform as Defendant Sher patrolled Mr. Smith's community in Brooklyn.

Mr. Smith is just one of scores of peaceful protesters who were met by unwarranted, excessive uses of force by NYPD officers during these protests. Since the protests began, several documented instances of NYPD officers' unwarranted uses of pepper spray on protesters have come to light. Moreover, NYPD officers were recorded pushing and charging Floyd-Taylor protesters without provocation or justification and arresting protesters *en masse* for nonviolently exercising their First Amendment right to challenge the police violence to which they were subjected.

The City has long suffered from a disturbing, well-documented, and enduring legacy of police violence against peaceful protesters. Importantly, for over a decade before the Floyd-Taylor

protests erupted, the City was already aware of the NYPD's long practice of using unconstitutionally excessive force against peaceful protesters. But the City did not act to end this unlawful, repressive, and violent practice before or during the Floyd-Taylor protests, nor did the City discipline the NYPD officers who carried out this unlawful practice. Instead, City officials praised the NYPD's response to the protests as images of beaten and bloodied demonstrators flashed across television screens and spread through social media. The City's failures have resulted in a host of lawsuits arising out of its unconstitutional response to the Floyd-Taylor protests, as well as several reports impugning the City's response, including a report by the City's inspector general that details the City's unduly repressive approach to policing peaceful protesters, which precipitated illegal police violence during the protests.

Defendant Sher's racially motivated assault on Mr. Smith, while unjustified and unlawful, was consistent with the NYPD's longstanding violent and repressive policies and practices at the time of the Floyd-Taylor protests. Mr. Smith's claims, as detailed herein, are one of several attempts to obtain an acknowledgment of, and recompense for, the harm wrought by the racially motivated, unjustified police violence that Mr. Smith and countless other protesters decried in the historic spring and summer of 2020.

## JURISDICTION and VENUE

1.      Jurisdiction is conferred upon this Court under 28 U.S.C. §§ 1331 and 1343(3) and (4), as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

2.      Plaintiff additionally invokes the supplemental jurisdiction of this Court under 28 U.S.C. § 1367(a) over any and all state and City law claims that are so related to the claims within the original jurisdiction of this Court that they form part of the same case or controversy.

3.      Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) because Plaintiff's claims arose within this District.

**JURY DEMAND**

4.      Plaintiff respectfully demands a trial by jury of all issues in this matter.

**PARTIES**

5.      On May 30, 2020, Plaintiff Andrew Smith was a resident of the County of Kings, City and State of New York. Plaintiff Andrew Smith currently resides in Philadelphia, Pennsylvania. Plaintiff is a Black man.

6.      Defendant City of New York is a municipal corporation duly organized and existing by virtue of the laws of the State of New York.

7.      Defendant City of New York maintains the NYPD, which performs all functions of a police department as per the applicable sections of the City's rules and regulations.

8.      On May 30, 2020, Defendant Bill de Blasio was the Mayor of the City of New York. Defendant de Blasio has final policymaking authority with respect to the NYPD. Defendant de Blasio is sued in his official and individual capacities.

9.      On May 30, 2020, Defendant Dermot Francis Shea was the Police Commissioner of the City of New York. Defendant Shea has final policymaking authority with respect to the NYPD. Defendant Shea is sued in his official and individual capacities.

10.     On May 30, 2020, Defendants Police Officers ("P.O.") Michael Sher and John Doe 1-10 were duly sworn police officers, detectives, Deputy Commissioners, Commanding Officers and/or Supervising Officers of the NYPD, and they were acting under the authority bestowed upon them by virtue of their official duties for the NYPD and under the supervision of the NYPD. Each of these Defendants is sued in his/her official and individual capacities.

## STATEMENT OF FACTS

### NYPD Officers, Including Defendant P.O. Michael Sher, Confront
### Plaintiff Andrew Smith and Other Peaceful Protesters

11.      In the spring and summer of 2020, thousands of New Yorkers participated in a series of demonstrations calling for racial equity and an end to police violence. These protests, which occurred for weeks around the City, were motivated in great part by widespread, public outrage over the deaths of two unarmed Black people who were killed by police officers—George Floyd and Breonna Taylor—as well as other police-involved killings of Black people in New York City.

12.      On May 30, 2020, Mr. Smith participated in a Floyd-Taylor Protest in Brooklyn, New York.

13.      Mr. Smith and other protesters began peacefully demonstrating at the Barclays Center in Brooklyn before continuing to the area of Bedford Avenue and Tilden Street, also in Brooklyn.

14.      Hundreds of individuals peacefully participated in this protest.

15.      An NYPD helicopter flew above the group at a low elevation so that protesters, including Mr. Smith, were affected by the winds generated by the aircraft, the so-called rotor wash. The rotor wash from the helicopter rotor blades blew hats off of protesters and caused some protesters to lose their balance.

16.      At approximately 5:30 p.m., Defendant P.O. Michael Sher was present in the area of Bedford Avenue and Tilden Street ("the area") in furtherance of his duties for the NYPD.

17.      He was one of dozens of NYPD officers policing this protest.

18.      At or around 5:30 p.m., an NYPD SUV began to move through the crowd of protesters that had, by this point, made its way to the area.

19.    Members of the NYPD then entered into a formation as they created a path for the police vehicle by yelling at and forcibly pushing the protestors in the area.

20.    These officers forcibly pushed protesters by using black clubs that were held horizontally in both hands and extended forward.

21.    Concurrently, the officers repeatedly yelled for individuals to step back.

22.    NYPD supervisors overseeing this group of officers were present amongst the group of police officers in the area. They can be seen on video footage of this protests wearing white shirts.

23.    Defendant Sher concealed a bottle of pepper spray within one of his hands that was positioned like a fist.

24.    Defendant Sher subsequently came into contact with dozens of protesters in the area, most of whom were white, while working in concert with other officers to clear the path for the patrol SUV.

**Defendant Sher Attacks Mr. Smith**

25.    As Defendant Sher and other officers made their way down Bedford Avenue, Mr. Smith, who was still in the area of Bedford Avenue and Tilden Street, was walking back towards Barclay's Center in a crowd of mostly white protesters.

26.    Mr. Smith and the surrounding protesters were wearing face coverings in an effort to prevent the spread of COVID-19 amid the ongoing coronavirus pandemic.

27.    Mr. Smith and the group of protesters around him walked away from the oncoming police vehicle with their hands raised high above their heads, to signal that they were not posing a threat to any of the police officers.

28.    At the same time, Defendant Sher walked within arm's reach of Mr. Smith and at least two white protesters who, like Mr. Smith, were walking with their hands raised.

29.     Mr. Smith was clearly walking with his hands raised to signal that he was nonviolently and peacefully protesting and did not pose a threat to Defendant Sher or any of the other NYPD officers at the protest.

30.     Mr. Smith's hands were both in the air and clearly visible to Defendant Sher as he approached Mr. Smith.

31.     Mr. Smith was not holding anything in his raised hands as Defendant Sher approached him.

32.     Without warning or provocation, Defendant Sher shoved Mr. Smith in his chest, forcibly snatched the mask from Mr. Smith's face, and shot him with pepper spray directly in his eyes.

33.     Defendant Sher's pepper spray was within a foot of Mr. Smith's face when deployed.

34.     Defendant Sher did not snatch the facemasks off of any of the white protesters who were also within arm's reach of Defendant Sher and standing next to Mr. Smith.

35.     Mr. Smith had an immediate and serious adverse reaction to this attack: he clutched at his burning eyes, blinded and in pain, as he stood frozen in agony before another peaceful protester came to his aid.

36.     The pain in Mr. Smith's eyes from the pepper spray was exacerbated by his contact lenses, which he was wearing when Defendant Sher assaulted him.

37.     The pepper spray also caused Mr. Smith's skin to burn, especially when exposed to the sun.

38.     After using pepper spray on Mr. Smith, Defendant Sher observed Mr. Smith writhing in pain.

39.     Defendant Sher never offered or provided medical care to Mr. Smith.

40.     Defendant Sher did not request medical services to render aid to Mr. Smith.

41.     Mr. Smith could not see anything after Defendant Sher deployed pepper spray on him.

42.     Before Mr. Smith could flush the pepper spray from his eyes, he had to remove his contacts.

43.     Mr. Smith then sat down on a nearby shaded stoop to try to recover.

44.     Defendant Sher never received any reports of Mr. Smith doing anything unlawful or threatening.

45.     Defendant Sher never observed Mr. Smith doing anything unlawful or threatening.

46.     Defendant Sher observed Mr. Smith walking peacefully with his hands raised, and he had no reason to believe that Mr. Smith posed a threat to him or anyone at the protest.

47.     Defendant Sher snatched off Mr. Smith's mask and shot pepper spray in Mr. Smith's face, but Defendant Sher did not engage in comparable conduct toward the similarly situated white protesters who were standing next to Mr. Smith. Defendant Sher malevolently assaulted and used excessive force against Mr. Smith, in conformity with the NYPD's approach to policing protests, with the intent to inhibit and punish Mr. Smith's exercise of his First Amendment rights to peacefully protest.

48.     Minutes after assaulting Mr. Smith, Defendant Sher spoke with other officers at the protest, attempted to obtain more pepper spray because he had used his allotment, and bragged to his NYPD colleagues about what he had done to Mr. Smith.

49.     The events leading up to and including Defendant Sher's assault on Mr. Smith, and his boasting about this assault, were captured on his and other officers' body worn video camera, as well as a bystander's cell phone video footage.

50. Defendant Sher's actions caused Mr. Smith to suffer physical and emotional harm, as well as other damages, from the pain and aftermath of being publicly shoved, demasked and sprayed with pepper spray.

## The NYPD's Intentionally Repressive and Violent Response to the Floyd-Taylor Protests

51. During the Floyd-Taylor protests, the NYPD employed a host of repressive tactics against protesters, including disproportionate military-style formations, unjustified physical assaults and unwarranted mass arrests.

52. Protesters, legal observers, and bystanders reported and complained of numerous acts of violence by members of the NYPD during the Floyd-Taylor Protests. Hundreds of protesters were arrested and subjected to excessive force by NYPD officers, who reportedly struck protesters with batons, threw protesters to the ground, and punched, kicked, and tackled protesters without provocation or justification.

53. During the protests, NYPD officers were captured on camera shoving and striking protesters, pushing through crowds of protesters in NYPD patrol SUVs, and indiscriminately deploying pepper spray on protesters without provocation.

54. *The Intercept* recently published an article explaining that the NYPD's Strategic Response Group ("SRG") led the violent crackdown on the protests. The SRG is described as a heavily militarized unit of several hundred officers that are trained to deal with public disorder events and terrorist acts.[1]

55. Human Rights Watch concluded that the NYPD's conduct during one of the Floyd-Taylor protests in Mott Haven "amount[ed] to serious violations of international human rights law"

---

[1] John Bolger and Alice Speri, *NYPD "Goon Squad" Manual Teaches Officers to Violate Protesters' Rights*, The Intercept (Apr. 7, 2021), https://theintercept.com/2021/04/07/nypd-strategic-response-unit-george-floyd-protests/.

and "appears to also violate civil rights protections of the U.S. Constitution and the NYPD's own Patrol Guide."[2]

56.     The City's Department of Investigation ("DOI"), which is the City's inspector general, has also made several critical findings in light of the NYPD's response to the Floyd-Taylor Protests, including a finding that the NYPD's "broad disorder control" approach to policing protests likely exacerbated tensions during the protests and "inevitably led to instances where NYPD acted indiscriminately as between lawful, peaceful protesters and unlawful actors, thereby exercising force beyond what was necessary under the circumstances."

57.     The City's Civilian Complaint Review Board ("CCRB") received 1,646 protest-related allegations associated with incidents that occurred between May 28 and June 20, 2020, of which 1,052 alleged improper, excessive uses of force by NYPD officers. The CCRB received more use of force complaints against NYPD officers on May 30, 2020—the day Defendant Sher assaulted Mr. Smith—than any other day during the height of the protests.

58.     Numerous lawsuits have been filed since the Floyd-Taylor Protests, challenging the City's role in fomenting NYPD officers' unlawful uses of force against the Floyd-Taylor protesters, including but not limited to:

> *Payne v. City of New York,* 20-cv-08924 (S.D.N.Y.), complaint brought by eleven Floyd-Taylor protesters alleging the City was intentionally violent and hostile towards the Floyd-Taylor protesters, and that Mayor de Blasio and the NYPD leadership explicitly endorsed this repressive response. In their complaint, the *Payne* plaintiffs describe NYPD's practice of using excessive force and retaliation against demonstrators for constitutionally protected protest activities. They also recount harrowing details of being assaulted by NYPD officers at the Floyd-Taylor Protests.

> *Samira v. City of New York*, 20-cv-10291 (S.D.N.Y.), class action complaint challenging NYPD's violent attack on the aforementioned Mott Haven Floyd-Taylor protesters. The *Samira* plaintiffs place the assault on the Mott Haven protesters as a part of the NYPD's

---

[2] Human Rights Watch, *"Kettling" Protesters in the Bronx: Systemic Police Brutality and Its Costs in the United States* (2020), https://www.hrw.org/report/2020/09/30/kettling-protesters-bronx/systemic-police-brutality-and-its-costs-united-states.

unconstitutional police practices, targeting communities of color. Mott Haven is a majority Black and Latinx neighborhood. In addition, they highlight City officials' expressions of support for the unjustified police violence used against the Floyd-Taylor protesters and hostility toward their messages.

*Sow v. City of New York,* 21-cv-533 (S.D.N.Y.), class action complaint alleging the NYPD carried out an unconstitutional policy of arresting Floyd-Taylor protesters in retaliation for exercising their First Amendment Rights. The *Sow* plaintiffs also allege that the City has a history of violently disrupting protests and failing to train officers on how to protect First Amendment Rights instead of violating the same.

*People of the State of New York v. City of New York*, 21-cv-322 (S.D.N.Y.), complaint brought by the State Attorney General's Office, alleging that the City failed to prevent or correct the NYPD's unconstitutional policing practices used during the Floyd-Taylor Protests. Specifically, the A.G.'s suit involves the NYPD's custom of unlawfully detaining and forcibly arresting Floyd-Taylor protesters, injuring several of the protesters in the process.

59.     Below are just a few examples of the many instances of NYPD officers employing unprovoked, violent, and repressive tactics when interacting with Floyd-Taylor protesters.

### *Unwarranted Uses of Pepper Spray*

60.     NYPD officers unnecessarily deployed pepper spray against protesters over a large area on at least 30 occasions, including against Mr. Smith, during the Floyd-Taylor Protests, in contravention of NYPD Patrol Guide[3] Procedure Number 221-07, which, *inter alia*: 1) prohibits the use of pepper spray in situations that do not require the use of force, including when an individual is merely resisting with minimal physical action (i.e., passively resisting); and 2) directs officers to avoid indiscriminately deploying pepper spray over a large area for crowd control.[4]

---

[3] According to the City's Civilian Complaint Review Board, "[t]he NYPD's Patrol Guide contains the rules that NYC police officers must follow in carrying out their official duties." City of New York, Civilian Complaint Review Bd, NYPD Patrol Guide, https://www1.nyc.gov/site/ccrb/investigations/nypd-patrol-guide.page (accessed on May 29, 2021).

[4] NYPD Patrol Guide Procedure Number 221-07 specifically provides:

Do <u>not</u> use O.C. pepper spray on subjects who passively resist (e.g., going limp, offering no active physical resistance). If possible, avoid using O.C. pepper spray on persons who appear to be in frail health, young children, women believed to be pregnant, or persons with known respiratory conditions. Avoid discharging O.C. pepper spray indiscriminately over a large area for disorder control. (Members who are specifically trained in the use of

61.     For example, on May 29, 2020, an NYPD officer deployed pepper spray on New York State Senator Zellnor Myrie after Senator Myrie encouraged the protesters around him to obey the officers' directives and explained to the officers that the protesters were, in fact, obeying their directives. In addition to Senator Myrie, NYPD officers deployed pepper spray on another elected official, Assembly Member Diana Richardson, and the protesters around her. During this incident, the officers also pushed their bicycle frames against Senator Myrie, Assembly Member Richardson, and the retreating protesters.

62.     On May 30, 2020, NYPD officers deployed pepper spray on protesters walking from Barclays Center to Flatbush Extension in Brooklyn without provocation or justification. The officers deployed pepper spray while the protesters were trying to comply with the officers' directions to "go home." Two officers also struck the retreating protesters with batons. The officers did not render aid to any of the protesters.

63.     The next day, on May 31, 2020, an NYPD officer on the F.D.R. drive in Manhattan twice deployed pepper spray on a group of peaceful protesters separated from said officer by a concrete barrier. This use of pepper spray was without provocation or justification. As a result of this use of pepper spray, protesters sustained injuries, which the NYPD officers on the scene did not treat.

---

O.C. pepper spray for disorder control may use O.C. pepper spray in accordance with their training, and within Department guidelines, and as directed by supervisors.) In addition, avoid using O.C. pepper spray in small contained areas such as automobiles and closets.

NYPD Patrol Guide, Procedure Number 221-07, *Use of Oleoresin Capsicum Pepper Spray Devices,* at 2, available at https://www1.nyc.gov/site/ccrb/investigations/nypd-patrol-guide.page.

64.     In addition, NYPD officers regularly pushed and charged protesters during the Floyd-Taylor protests.

65.     For example, on May 28, 2020, NYPD officers formed a line and rammed the frames of their bicycles into protesters standing on a sidewalk in Union Square, striking one protester on her head and arm as they forced her over a concrete barrier. The protesters did not present any threat of harm and were not resisting or evading arrests, but the officers assaulted them anyway.

66.     On May 29, 2020, NYPD officers repeatedly charged protesters in the Clinton Hill neighborhood of Brooklyn without warning, causing one protester to fall against a car and then to the ground; she sustained a concussion and a gash on her forehead as a result. The officers charged the protesters while the protesters were standing stationary, chanting about George Floyd and Breonna Taylor. No medical aid was rendered to the injured woman.

67.     That same night, in Bedford-Stuyvesant in Brooklyn, another group of NYPD officers charged chanting protesters without warning, pushing one protester to the ground where an NYPD officer struck her on the head with a baton, causing her to suffer a laceration that bled profusely. The protesters were merely walking towards Herbert von King Park when the officers charged them.

68.     On May 31, 2020, near Dekalb and Flatbush Avenues in Brooklyn, NYPD officers charged protesters without warning or provocation before striking one protester with their batons, causing him to sustain a fractured eye socket and lacerations.

69.     On June 4, 2020, just after the 8:00 p.m. curfew, NYPD officers encircled and trapped peaceful protesters in the Mott Haven section of the Bronx before pushing the protesters tightly together while striking protesters with batons and shields, thrusting their bicycles into

people at the Mott Haven protest, and spraying protesters with pepper spray. The NYPD officers then arrested at least 263 of the protesters, some of whom were medics and essential workers exempt from the curfew.

70.     Dozens of protesters, legal observers, and bystanders at the Mott Haven protest sustained injuries at the hands of NYPD officers, including lacerations, a broken nose, lost tooth, sprained shoulder, broken finger, split lip, black eyes and bruises, and difficulty breathing and seeing due to the use of pepper spray.

71.     After a thorough review of this protest, Human Rights Watch denounced the NYPD officers' "excessive use of force, violations of the rights to free expression and peaceful assembly, arbitrary arrests and detention, and cruel and degrading treatment of detainees."[5]

**The City's Malfeasance Was the Moving Force Behind the NYPD's Repression of the Floyd-Taylor Protests and Defendant Sher's Actions**

*The City's Policies, Practices, and Customs Precipitated the Assault*

72.     For years prior to May 30, 2020, the City knew that NYPD officers had a pattern and practice of violating the constitutional rights of peaceful protesters, by use of excessive force or otherwise, but it did not promulgate or enforce policies or other remedial interventions to end that unlawful pattern and practice.

73.     A review of police-protester interactions in the City over the years reveals that the NYPD's use of excessive force against the Floyd-Taylor Protests is in keeping with a longstanding, broad pattern of the NYPD repeatedly responding to protests with violence or other repressive tactics.

74.     For instance, during the 2004 Republican National Convention ("2004 RNC"), protesters on Fulton Street in Manhattan were granted permission to protest on the sidewalk, only

---

[5] Human Rights Watch, *supra* note 2.

for then-Deputy Chief Terence Monahan to revoke this permission minutes later. Monahan, who was at the protest, then announced, without the assistance of a bullhorn, that the protesters would be arrested if they did not disperse. But Monahan and the NYPD officers did not give the protesters a chance to disperse before arresting them en masse. This and similar mass arrests during the 2004 RNC resulted in more than 80 federal civil rights cases against the NYPD. Ultimately, a federal district court issued a summary judgment motion against the City, finding that there was no probable cause for the mass arrests of the protesters on Fulton Street. *See Dinler v. City of New York*, 1:04-cv-7921, Dkt. No. 312 (S.D.N.Y.). Notably, Monahan was later named the NYPD Chief of Department; he served in this role throughout the Floyd-Taylor Protests.

75.     Years after the RNC, in 2012, a protester named Don Fitzgerald was assaulted in the Financial District of Manhattan while participating in a demonstration commemorating the six-month anniversary of the Occupy Wall Street ("OWS") movement. Without provocation or warning, multiple NYPD officers grabbed him and threw him face-down to the ground, where one of the officers hit Mr. Fitzgerald at least ten times in the face, injuring him in the process.

76.     Mr. Fitzgerald later sued the City for this assault in *Marom v. City of New York*, 1:15-cv-2017 (S.D.N.Y.). Mr. Fitzgerald died before he could finish prosecuting this case, but not before his *Monell* claim regarding excessive force survived the City's motion for summary judgment.[6] His estate later dismissed the case for reasons not specified on the case docket.

77.     Another OWS protester, Jasom Marlin, sustained injuries in 2011, when several NYPD police officers dragged him through a crowd of protesters in Union Square, flung him to the ground and pinned him there. As a result, Mr. Marlin's elbow was dislocated and fractured, and the ligaments attached to his elbow were torn. Mr. Marlin later sued the City for this assault,

---

[6] *Marom v. City of New York*, No. 15-CV-2017 (PKC), 2016 WL 916424, at *7 (S.D.N.Y. Mar. 7, 2016), *on reconsideration in part,* No. 15-CV-2017 (PKC), 2016 WL 5900217 (S.D.N.Y. July 29, 2016).

in *Marlin v. City of New York*, 1:15-cv-2235 (S.D.N.Y.). The City eventually settled Mr. Marlin's claims against the City and five NYPD officers.

78.     Also in 2011, five NYPD officers, without justification or provocation, pinned an OWS protester named Eric Gersbacher to the ground in Zuccotti Park in Lower Manhattan, where they punched him repeatedly, causing him to suffer cuts, bruises and an asthma attack. Prior to assaulting Mr. Gersbacher, several NYPD officers threw other protesters down to the ground and arrested them as well. Mr. Gersbacher later sued the City for this assault. *See Gersbacher v. City of New York*, 1:14-cv-7600 (S.D.N.Y.). At trial, a jury found NYPD Officer Edward Winski liable for using excessive force against Mr. Gersbacher at the OWS protest. The City paid for Winski's defense and Mr. Gersbacher's attorneys' fees, costs, and expenses.

79.     More recently, in December 2020, the DOI found that the NYPD lacked a clearly defined strategy tailored to respond to large scale protests of police.[7] This, despite the fact that: (1) as the DOI noted, NYPD typically handles between approximately 20 and 30 protests of some kind per day[8]; and (2) the City was aware of the documented instances of NYPD officers engaging in unlawful violence and other misconduct directed toward peaceful protesters at large demonstrations such as the 2004 RNC and OWS.

80.     The broad disorder control approach adopted by the City focuses on force and control (i.e., escalation). Tactics adhering to this approach include use of force, kettling, and mass arrests.

---

[7] NYC Dep't of Investigation, *Investigation into NYPD Response to the George Floyd Protests* (Dec. 2020), available at https://www1.nyc.gov/site/doi/newsroom/public-reports.page (hereinafter 2020 DOI Investigation). In addition, the head of the City's largest police union, Patrick Lynch of the Police Benevolent Association, blamed a "failure of New York City's leadership" for sending officers to the Floyd-Taylor protests "with no plan, no strategy and no support." Press Release, NYC Police Benevolent Assoc., *PBA Statement on Attorney General*, http://nycpba.org/press-releases/2021/pba-statement-on-attorney-generals-protest-lawsuit/.

[8] 2020 DOI Investigation, *supra* note 7, at 53.

81.     The DOI found that this disorder control approach likely exacerbated tensions during the protests and "inevitably led to instances where NYPD acted indiscriminately as between lawful, peaceful protesters and unlawful actors, thereby exercising force beyond what was necessary under the circumstances."[9] Prior to May 30, 2020, City officials knew or should have known about several of the deficiencies detailed in the DOI report, including:

> a.  The City's policy and practice of escalating police encounters with protesters by utilizing a broad disorder-control approach to policing protests;
>
> b.  The City's failure to develop a particularized strategy tailored to quell escalating tensions between police and participants in the Floyd-Taylor Protests, who were specifically protesting against police overreach, abuse and brutality; and
>
> c.  The City's policy and practice of granting officers and supervisors nearly unfettered discretion to respond to facts and circumstances on the ground at protests.

82.     Each of the deficiencies detailed above played a vital role in precipitating Defendant Sher's assault on Mr. Smith.

*The City's Failure to Adequately Train, Supervise, or Discipline Precipitated the Assault*

83.     The DOI also found that the NYPD deployed officers to Floyd-Taylor Protests who lacked sufficient training on policing protests.

84.     Importantly, specialized policies and training—emphasizing de-escalation and differentiation of protesters and lawbreakers—were needed to protect the First Amendment rights of Mr. Smith and the other Floyd-Taylor Protest demonstrators.

85.     The DOI found that, in the absence of these specialized policies and training, there were occasions during the Floyd-Taylor Protests in which NYPD officers exercised their tactical discretion in an ineffective and disproportionate manner.

---

[9] *Id.* at 40.

86.     For instance, in 2015, the DOI found that the "NYPD's Patrol Guide does not properly instruct officers to de-escalate encounters with the public," and "NYPD training does not adequately focus on de-escalation."[10] Further, the DOI found that "officers too often . . . escalated encounters themselves."[11]

87.     Five years later, in 2020, the DOI similarly found that NYPD officers received deficient training regarding policing protests because this training was limited to use of force and crowd control tactics (e.g., kettling, mass arrests, and baton and pepper spray use), with little-to-no emphasis on de-escalation and how to effectively communicate with protesters to maintain peace and order. As highlighted by the DOI, these tactics "produced excessive enforcement" at the Floyd-Taylor Protests.[12]

88.     The DOI noted that the NYPD officers' deficient training "raises concerns that officers lack the tools to make the necessary discretionary or tactical judgments during protests, particularly those as complex as the Floyd-Taylor protests."[13]

89.     Also, the NYPD's supervision of its officers was deficient during the Floyd-Taylor Protests. For example, the City chose not to make consistent statements iterating the sanctity of the protesters' rights and safety, such as "the protesters are not your enemy" and "protecting and defending constitutional rights is your duty and your honor," which would have helped officers manage any increased stress related to their interactions with the Floyd-Taylor protesters. Further, as mentioned above, NYPD superior and supervising officers were present during some of the

---

[10] NYC Dept. of Investigation, Office of Inspector Gen. for the NYPD, *Police Use of Force in New York City: Findings and Recommendations on NYPD's Policies and Practices*, 2-3 (Oct. 1, 2015), https://www1.nyc.gov/assets/doi/press-releases/2015/oct/pr_uofrpt_100115.pdf (hereinafter 2015 DOI Investigation).

[11] *Id.* at 29.

[12] 2020 DOI Investigation, *supra* note 7, at 39-49.

[13] *Id.* at 62.

NYPD-officer assaults on peaceful protesters, but they refused to intervene and stop the violations of the protesters' constitutional rights.

90.     As the DOI noted, the alternative to the NYPD's broad disorder control approach to policing protest is a "differentiated approach," which has three key components: (1) arrest sparingly (mass arrests of protest participants are rarely productive); (2) use force as a last resort; (3) wherever possible, avoid use of overly restrictive physical barriers and other crowd containment measures."[14] This differentiated approach ensures that officers impose a burden only on those actually engaged in criminal activity. But the NYPD chose not to adopt this approach when dealing with the Floyd-Taylor protesters, including Mr. Smith. Instead, it chose the aforementioned broad disorder control approach.

91.     In addition, the City has an ongoing practice of not adequately disciplining NYPD officers who use excessive force against peaceful protesters and other residents of the City.

92.     The City and its officials, including Mayor de Blasio, NYPD Commissioner Dermott Shea, and Chief Monahan, praised the actions of the NYPD during the Floyd-Taylor Protests and encouraged further police violence.

93.     On May 30, 2020, Mayor de Blasio responded to a video of an NYPD SUV driving into a crowd of peaceful protesters by stating, "I do believe NYPD has acted appropriately."

94.     On June 4, 2020, Mayor de Blasio held a press conference in which he praised the Department's response to the Floyd-Taylor Protests, offering no criticisms of the NYPD's use of violence against protesters.

---

[14] *Id.* at 36-37; *see also* Police Executive Research Forum, *The Police Response to Mass Demonstrations: Promising Practices and Lessons Learned*, Washington, D.C.: Office Of Community Oriented Policing Services 16-21 (2018), available at https://www.policeforum.org/assets/PoliceResponseMassDemonstrations.pdf.

95.     On June 5, 2020, when discussing the Mott Haven protest, in which NYPD officers injured and/or wrongfully arrested dozens of protesters, medics, legal observers, and bystanders, Commissioner Shea said that the NYPD officers at Mott Haven acted in conformity with "a plan which was executed nearly flawlessly."

96.     The NYPD's highest-ranking uniformed officer, Chief Terence Monahan, was present during the police uses of force at the Mott Haven protest and failed to intervene to protect the protesters.

97.     The 2015 DOI report mentioned above also notes that the "NYPD frequently failed to impose discipline even when provided with evidence of excessive force."[15] The report explained that the NYPD failed to impose discipline for 37 of 104 substantiated allegations of excessive force from 2010 to 2014. Further, on information and belief, the City never punished any of the officers involved in the assaults on peaceful protesters that gave rise to the *Dinler*, *Maron*, *Marlin*, and *Gersbacher* cases.

98.     In sum, the NYPD has failed to adequately train, supervise, and/or discipline its officers with respect to responding to peaceful protests, to an extent that amounts to deliberate indifference to the rights of peaceful protesters. This policy and practice and failure to train, supervise, and/or discipline caused Mr. Smith's injuries.

---

[15] 2015 DOI Investigation, *supra* note 10, at 4.

## FIRST CAUSE OF ACTION:
## Fourth and/or Fourteenth Amendment Excessive Force
## (Against all Defendants)

99.     Plaintiff repeats, reiterates and realleges each and every allegation above and below with the same force and effect as if fully set forth herein.

100.     While participating in the protests, Mr. Smith was at all relevant times non-violent and non-resistant; he posed absolutely no security threat; and he did not disobey or refuse to obey a police order. Nevertheless, Defendant Sher physically shoved him, ripped off his COVID-19 protective mask, and pepper sprayed Mr. Smith directly in his eyes. The degree of force Defendant Sher used was starkly disproportionate to the security risk that Mr. Smith posed (none) and/or objectively unreasonable in light of the facts and circumstances confronting Defendant Sher; it was intended only to oppress and injure Mr. Smith, and it served no legitimate government purpose. Defendant Sher's use of force also caused Mr. Smith substantial physical injuries. As such, Defendant Sher's use of force violated Mr. Smith's rights under the Fourth and/or Fourteenth Amendment to the United States Constitution.

101.     The violations of Mr. Smith's Fourth and/or Fourteenth Amendment rights were directly and proximately caused by the actions and/or inactions of Defendants, who have encouraged, tolerated, ratified, and/or have been deliberately indifferent to the above-mentioned patterns and practices, and/or have been deliberately indifferent to the need for more or different training, supervision, investigation, and/or discipline of police officers. By failing to adequately train, investigate, discipline, and/or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with their employees because the need to act is so obvious and the inadequacy of current practices is so likely to result in a

deprivation of federal rights, Defendants have deprived Mr. Smith of rights, remedies, privileges, and immunities granted by the U.S. Constitution.

**SECOND CAUSE OF ACTION:**
**Fourteenth Amendment Race Discrimination**
**(Against Defendant Sher)**

102.     Plaintiff repeats, reiterates and realleges each and every allegation above and below with the same force and effect as if fully set forth herein.

103.     The Fourteenth Amendment to the United States Constitution provides in relevant part:

> *No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.*

104.     Defendant Sher targeted Mr. Smith and discriminately and selectively employed force upon Mr. Smith because of Mr. Smith's race when he bypassed similarly situated white protestors to snatch off Mr. Smith's mask and deploy pepper spray directly into Mr. Smith's face. In so doing, Defendant Sher deprived Mr. Smith of his rights to equal protection, in violation of the Fourteenth Amendment to the United States Constitution.

105.     Moreover, in targeting and assaulting the law abiding, peacefully protesting Mr. Smith, Defendant Sher acted in a capricious and irrational manner, thereby injuring Mr. Smith in contravention of the Fourteenth Amendment to the United States Constitution.

106.     Finally, Defendant Sher failed to render aid to Mr. Smith, in violation of Mr. Smith's rights under the Fourteenth Amendment to the United States Constitution.

### THIRD CAUSE OF ACTION:
### Art. 1, § 11, of NY State Constitution – Equal Protection
### (Against Defendant Sher and the City of New York)

107.     Plaintiff repeats, reiterates, and realleges each and every allegation above and below with the same force and effect as if fully set forth herein.

108.     Article I, § 11 of the New York State Constitution provides in relevant part:

> *No person shall be denied the equal protection of the laws of this state or any subdivision thereof . . . .*

109.     Defendant Sher targeted Mr. Smith and discriminately and selectively employed force upon Mr. Smith because of Mr. Smith's race when he bypassed similarly situated white protestors to snatch off Mr. Smith's mask and deploy pepper spray directly into Mr. Smith's face. In so doing, Defendant Sher deprived Mr. Smith of his rights under the New York State Constitution.

### FOURTH CAUSE OF ACTION:
### First Amendment Free Speech and Assembly
### (Against all Defendants)

110.     Plaintiff repeats, reiterates, and realleges each and every allegation above and below with the same force and effect as if fully set forth herein.

111.     The First Amendment to the United States Constitution provides in relevant part:

> *Congress shall make no law . . . abridging the freedom of speech . . . ; or the right of the people peaceably to assemble . . . .*

112.     By participating in a peaceful demonstration about the killings of Black people at the hands of police officers and discriminatory policing in his community, Mr. Smith was exercising a right protected by the First Amendment.

113.     Defendant Sher's use of force against Mr. Smith was motivated or substantially caused by Mr. Smith's exercise of that right, and it effectively chilled his exercise of that right.  It

also physically injured Mr. Smith. As such, it constituted unlawful retaliation against Mr. Smith by a public official for engaging in First Amendment protected activity.

114.    The violations of Mr. Smith's First Amendment rights were directly and proximately caused by the actions and/or inactions of Defendants, who have encouraged, tolerated, ratified, and/or have been deliberately indifferent to the above-mentioned patterns and practices, and/or have been deliberately indifferent to the need for more or different training, supervision, investigation, and/or discipline of police officers. By failing to adequately train, investigate, discipline, and/or supervise subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with their employees because the need to act is so obvious and the inadequacy of current practices is so likely to result in a deprivation of federal rights, Defendants have deprived Mr. Smith of rights, remedies, privileges, and immunities granted by the U.S. Constitution.

## FIFTH CAUSE OF ACTION:
### Art. 1, §§ 8 & 9, NY State Constitution – Free Speech & Assembly
### (Against Defendant Sher and the City of New York)

115.    Plaintiff repeats, reiterates, and realleges each and every allegation above and below with the same force and effect as if fully set forth herein.

116.    Article I, § 8 of the New York State Constitution provides in relevant part:

> *Every citizen may freely speak, . . . on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech . . . .*

117.    Article I, § 9 of the New York State Constitution also provides in relevant part:

> *No law shall be passed abridging the rights of the people peaceably to assemble and to petition the government, or any department thereof . . . .*

118.    By participating in a peaceful demonstration about the killings of Black people at the hands of police officers and discriminatory policing in his community, Mr. Smith was

exercising a right protected by the New York State Constitution. Defendant Sher's use of force against Mr. Smith was motivated or substantially caused by Mr. Smith's exercise of that right and effectively chilled his exercise of that right. As such, it constituted unlawful retaliation against Mr. Smith by a public official for engaging in activity protected by the New York State Constitution.

### SIXTH CAUSE OF ACTION:
### Violation of NYC Admin Code § 14-151
### (Against Defendant Sher and the City of New York)

119. Plaintiff repeats, reiterates, and realleges each and every allegation above and below with the same force and effect as if fully set forth herein.

120. Section 14-151 of the Administrative Code of the City of New York prohibits the NYPD and its members from engaging in bias-based profiling, which the provision defines as an act of a law enforcement officer that relies on actual or perceived race as the determinative factor in initiating a law enforcement action against an individual.

121. Defendant Sher intentionally engaged in bias-based profiling because Plaintiff's race was the determinative factor in his decision to pull down Plaintiff's mask and pepper spray Plaintiff directly in his face. Moreover, Defendant Sher's biased-based profiling of Plaintiff was not justified by factors unrelated to unlawful discrimination.

### SEVENTH CAUSE OF ACTION:
### Common Law Assault and Battery
### (Against Defendant Sher and the City of New York)

122. Plaintiff repeats, reiterates, and realleges each and every allegation above and below with the same force and effect as if fully set forth herein.

123. The degree of force Defendant Sher used was starkly disproportionate to the security risk posed by Mr. Smith (none) and/or objectively unreasonable in light of the facts and circumstances confronting Defendant Sher; it was intended only to oppress and injure Mr. Smith, and it served no legitimate government purpose. Defendant Sher's use of force also caused Mr. Smith substantial physical injuries. *See Graham v. City of N.Y.*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013) ("Federal excessive force claims and state law assault and battery claims against police officers are nearly identical.").

## PRAYER FOR RELIEF

124. Within ninety (90) days after one or more claims stated herein accrued, Plaintiff duly served upon, presented to, and filed with the City, a Notice of Claim setting forth all facts and information required under the General Municipal Law § 50-e. Plaintiff appeared for a Statutory Hearing pursuant to General Municipal Law § 50-h on December 8, 2020. The City has wholly neglected or refused to make an adjustment or payment thereupon, and more than thirty (30) days have elapsed since the presentation of such claims. This action was commenced within one (1) year and ninety (90) days after one or more of the causes of action stated herein accrued. This action falls within one or more of the exceptions as outlined in C.P.L.R. § 1602.

WHEREFORE, Plaintiff requests that this Court:

a. Assume jurisdiction over this matter;

b. Declare that Defendants' actions violate the law;

c. Enjoin Defendants and all of their officers, employees, and agents from implementing, applying, or taking any action whatsoever in furtherance of the unconstitutional practices enumerated herein, and order Defendants and all of their officers, employees, and agents to take affirmative steps to achieve compliance with the United States Constitution, New York State Constitution, and the New York City Administrative Code;

d.  Award Plaintiff compensatory and punitive damages;

e.  Award the Plaintiff attorneys' fees and costs; and

f.  Grant any other relief that the Court deems appropriate.

Dated: JAMAICA, NEW YORK
June 1, 2021

s/ Kareem R. Vessup
Kareem R. Vessup
The Law Office of Kareem R. Vessup, Esq.
89-31 161st Street Suite 705
Jamaica, New York
(718) 219-8744 – P
(718) 228-7733 – F
kvessup@vessuplaw.com

Alain Massena
Massena Law P.C.
305 Broadway, Suite 1001
New York, NY 10007
212-766-1700
avm@massenalaw.com

Omavi Shukur
Initiative for a Just Society
435 West 116th Street, Rm. 603, C14
New York, N.Y. 10027
(212) 853-2138
omavi.shukur@law.columbia.edu

Raymond Audain
NAACP Legal Defense and Educational
  Fund, Inc.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
raudain@naacpldf.org